## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHARLES D. MALONE and ELIZABETH MALONE,<br><br>    Plaintiffs,<br><br>    v.<br><br>AIR & LIQUID SYSTEMS CORPORATION, et al.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 14-406-GMS-SRF |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently, there are three motions for summary judgment before the court in this asbestos-related personal injury action.[1] The motions were filed by Defendants, Cummins, Inc. ("Cummins") (D.I. 377), Foster Wheeler Corporation ("Foster Wheeler") (D.I. 379), and CBS Corporation ("CBS")[2] (D.I. 381), (collectively "Defendants").  For the reasons set forth below, and as indicated in the chart *infra*, the court recommends granting Defendants' motions for summary judgment.

| Defendant | Motion for Summary Judgment |
|---|---|
| Cummins, Inc. | GRANT |
| CBS Corporation | GRANT |
| Foster Wheeler Energy Corporation | GRANT |

---

[1] Multiple defendants filed motions for summary judgment in this action.  The motions filed by defendants other than Cummins, Foster Wheeler, and CBS have been terminated, granted, or withdrawn.  (D.I. 411–413, 425, 431; 7/1/15 Tr. at 4–5)

[2] CBS is a successor by merger to a Pennsylvania corporation formerly known as Westinghouse Electric Corporation.  (D.I. 382 at 1 n.1)

## II.     BACKGROUND

### A. Procedural History

Charles and Elizabeth Malone ("Plaintiffs") filed this asbestos-related action against

multiple defendants on April 1, 2014, asserting personal injury claims proximately caused by Mr.

Malone's alleged wrongful exposure to asbestos.  (D.I. 1) Plaintiffs amended the complaint on

April 8, 2014 to add an additional defendant.  (D.I. 8)

Cummins filed a motion for summary judgment on April 3, 2015.  (D.I. 377) Foster

Wheeler and CBS filed summary judgment motions April 7, 2015.  (D.I. 379, 381) Plaintiffs

oppose the motions.  (D.I. 401, 407, 408)  On July 1, 2015, the court held oral argument to

address Defendants' motions.  (7/1/15 Tr.)

### B. Facts

#### 1.  Plaintiffs' alleged exposure history

Plaintiffs allege that Mr. Malone developed mesothelioma as a result of exposure to

asbestos-containing products during his career at Ingalls Shipyard in Pascagoula, Mississippi

from approximately 1964 to 1982.  (D.I. 8 at ¶ 45(a)) Plaintiffs contend that Defendants

manufactured, sold, or distributed the products at issue, which were allegedly designed to

incorporate asbestos-containing exterior insulation.  (*Id*. at ¶ 2) Accordingly, Plaintiffs assert

negligence, punitive damages, strict liability, breach of warranty, and loss of consortium claims

against the moving Defendants.[3]  (D.I. 8)

---

[3] Plaintiffs also assert claims for conspiracy and premises liability against other defendants.  (D.I. 8)

Mr. Malone testified regarding his alleged asbestos exposure at depositions on December 21, 1981[4] and June 25, 2014. (D.I. 401, Exs. 1–3) While working at Ingalls Shipyard, Mr. Malone was employed by several different companies, including Ingalls Shipbuilding, Badham Insulation ("Badham"), and Frigitemp Marine ("Frigitemp"). (*Id.*, Ex. 1 at 16:16–21:16; D.I. 8 at ¶ 45(a)) Mr. Malone started work as an apprentice ship fitter at Ingalls Shipyard in 1964. (D.I. 401, Ex. 1 at 16:5–17:22) From 1965 to 1973, Mr. Malone worked for Badham as an insulator on approximately twenty ships. (*Id.*, Ex. 1 at 17:24–18:11; D.I. 8 at ¶ 45(a)) He started as an apprentice, mixing mud and carrying materials to the mechanics. (D.I. 401, Ex. 1 at 18:12–19:6) He moved to the fabrication shop in 1965, where he made removable insulation pads and cut fittings. (*Id.*) Mr. Malone was promoted to supervisor and remained in that position until leaving Badham in 1973. (*Id.*, Ex. 1 at 19:7–15) Subsequently, Mr. Malone worked for Ingalls Shipbuilding as a subcontract administrator for approximately eight to nine months. (*Id.*, Ex. 1 at 19:19–20:11) From 1975 to 1979, he worked as a subcontractor and general superintendent for Frigitemp. (*Id.*, Ex. 1 at 20:13–21:9) Mr. Malone then moved back to Ingalls Shipbuilding. (*Id.*) He stayed at Ingalls Shipbuilding until April of 1982, when he moved to Great Barrier Insulation Company in Greenville, South Carolina. (*Id.*, Ex. 1 at 21:10–21)

Mr. Malone worked primarily as an insulator during his employment with Ingalls Shipbuilding, Badham, and Frigitemp. (*Id.*, Ex. 1 at 16:5–9) He insulated several different types of equipment, including turbines, boilers, and emergency generators. (*Id.*, Ex. 1 at 33:11–34:17) The insulation consisted of removable insulation pads made out of A-Cloth and amosite. (*Id.*) Mr. Malone rolled out the amosite on a table and used an electric knife to cut it to fit into A-

---

[4] Mr. Malone was deposed as a third-party witness on December 21, 1981 in connection with *James L. Jackson v. Johns-Manville Sales Corp.*, Civ. No. S79-0211 (N), filed in the United States District Court for the Southern District of Mississippi Southern Division.

Cloth pads, which would be applied to various equipment. (*Id.*, Ex. 1 at 32:8–33:10) The insulation process generated much dust and debris. (*Id.*, Ex. 1 at 49:15–50:14) Mr. Malone never wore a protective mask or respirator. (*Id.*, Ex. 2 at 132:20–22) He did not see warnings related to asbestos on insulation products until the last year he worked at Badham. (*Id.*, Ex. 2 at 127:11–28:1)

Dr. Eugen J. Mark ("Dr. Mark") and Shafter Dunnam ("Dunnam") testified regarding Mr. Malone's alleged exposure to Defendants' asbestos-containing products. (*Id.*, Exs. 4, 7) Dr. Mark reviewed Mr. Malone's medical records and concluded that general occupational asbestos exposure caused Mr. Malone's malignant mesothelioma. (*Id.*, Ex. 7 at 4)

Dunnam testified that he worked as an insulator at Ingalls Shipyard during the same time as Mr. Malone. (*Id.*, Ex. 4 at 22:11–20, 23:1–27:6) However, Dunnam could not recall on what vessels Mr. Malone worked, whether he and Mr. Malone ever worked on the same vessel at the same time, or whether Mr. Malone worked around any of Defendants' products. (*Id.*) However, Dunnam testified that he was covered in dust each day while working as an insulator. (*Id.*, Ex. 4 at 21:17–22:3) He assumed that Mr. Malone would have been exposed to similar amounts of asbestos-containing dust. (*Id.*)

### 2. Plaintiffs' product identification evidence

#### a. Cummins

Mr. Malone identified working with Cummins emergency generators at Ingalls Shipyard. (*Id.*, Ex. 2 at 135:15–19) He remembered seeing Cummins' name printed on the generators. (*Id.*, Ex. 2 at 145:19–46:4) Mr. Malone testified that the generators themselves were not insulated. (*Id.*, Ex. 1 at 59:7–10) Only the exhaust piping attached to the generators was insulated. (*Id.*)

4

Cummins submits that the exhaust piping arrived at the shipyard "bare metal." (D.I. 378 at 11)
Plaintiffs do not submit evidence to refute this assertion.

Mr. Malone alleges asbestos exposure from Cummins' generators solely through the
insulation he applied to exhaust piping attached to the outside of the generators. (D.I. 401, Ex. 1
at 59:7–19, Ex. 2 at 136:2–8) However, he did not know who manufactured the exhaust piping or
whether it was in place when the generators were installed. (*Id.*, Ex. 2 at 147:16–23) Mr. Malone
testified that he insulated the exhaust piping with materials supplied by his employer, Badham.
(*Id.*, Ex. 2 at 149:6–8) The process of insulating the exhaust piping with asbestos materials took
two workers approximately two full days to complete. (*Id.*, Ex. 2 at 149:12–21)

### b. CBS

Mr. Malone identified working with Westinghouse turbines at Ingalls Shipyard. (D.I.
408, Ex. 1 at 53:13–21) Westinghouse turbines arrived at the shipyard bare metal with no
insulation attached to them. (*Id.*, Ex. 1 at 51:10–19) Mr. Malone insulated the tops and bottoms
of the turbines with calcium silicate and block insulation. (*Id.*, Ex. 1 at 51:10–52:13, 23:13–
24:1) Mr. Malone recalled that turbine insulation projects required 100 to 150 man hours of labor
to complete "from the fitting and measuring [to] preparing the cloth." (*Id.*, Ex. 1 at 51:10–52:20)

### c. Foster Wheeler

Mr. Malone identified working with Foster Wheeler boilers at Ingalls Shipyard. (D.I.
401, Ex. 1 at 46:22–47:5) Foster Wheeler boilers arrived at the shipyard "bare metal." (*Id.*, Ex. 2
at 121:7–22) Mr. Malone identified Foster Wheeler because each boiler was marked with the
name of the manufacturer. (*Id.*, Ex. 2 at 116:6–17:5) Mr. Malone insulated the exterior of the
steam drum of Foster Wheeler boilers with calcium silicate. (*Id.*, Ex. 1 at 46:11–21) He
estimated that the insulation process took four or five workers one week to complete. (*Id.*, Ex. 1

5

at 49:2–14) Plaintiffs assert that Foster Wheeler specified in an "Insulation Standards Catalog" that customers use "approved materials" with the boilers, including asbestos cloth, amosite asbestos insulation blocks, and amosite asbestos pipe covering.  (D.I. 407 at 9, Ex. 5 at 6–11)

## III.   STANDARD OF REVIEW

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact.  *See Celotex*, 477 U.S. at 321.  The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).  The non-movant must support its contention by citing to particular documents in the record, by showing that the cited materials do not establish the absence or presence of a genuine dispute, or by showing that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  The existence of some evidence in support of the non-moving party may not

be sufficient to deny a motion for summary judgment; rather, there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue. *See Anderson*, 477 U.S. at 249. If the non-moving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322. Additionally, because a loss of consortium claim is derivative of the injured spouse's claim for injuries under Mississippi law, a grant of summary judgment applies to both spouses' claims against a defendant. *See* Miss. Code Ann. § 93-3-1 (1968); *see also McCoy v. Colonial Baking Co.*, 572 So. 2d 850, 854 (Miss. 1990).

### B. Mississippi Law

A federal court sitting in diversity is "required to apply the substantive law of the state whose laws govern the action." *Robertson v. Allied Signal*, 914 F.2d 360, 378 (3d Cir. 1990). Consequently, the parties agree that Mississippi substantive law applies to this action. (D.I. 305)

### 1. Product identification and causation

Mississippi courts apply the "frequency, regularity, and proximity" test in evaluating a plaintiff's asbestos-related claims. *Monsanto Co. v. Hall*, 912 So. 2d 134, 137 (Miss. 2005) (citing *Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 757 (Miss. 2005) (holding that a plaintiff must show: (1) he worked with or around a particular defendant's product, (2) with sufficient frequency and regularity, (3) in proximity to where he actually worked, (4) and that it was probable his alleged exposure to that defendant's product caused his injury)). As such, Plaintiffs must identify Defendants' products, demonstrate exposure to those products, and establish the causal connection to Mr. Malone's injuries. *Id.* Summary judgment is appropriate if Plaintiffs fail to meet the burden of proving product identification, exposure, and causation under the frequency, regularity, and proximity test. *See Gorman-Rupp*, 908 So. 2d at 757 (granting

7

summary judgment where the plaintiff failed establish causation); *Monsanto*, 912 So. 2d at 137

(granting summary judgment where the plaintiff failed to identify exposure to any particular

product).

Plaintiffs argue that these factors are to be applied "less rigidly" in cases involving

mesothelioma.[5]  In support of this claim, Plaintiffs rely on a case from the Seventh Circuit and

another from the New Jersey Superior Court: *Tragarz v. Keene Corp.*, 980 F.2d 411, 421 (7th

Cir. 1992) and *Kurak v. A.P. Green Refractories Co.*, 689 A.2d 757, 765–66 (N.J. Super. Ct.

App. Div. 1997).[6]  However, these courts do not apply Mississippi law. *See Tragarz*, 980 F.2d at

417; *Kurak*, 689 A.2d at 761–62. Additionally, other courts have expressly declined to follow

these cases, refusing to alter the frequency, regularity, and proximity standard. *See, e.g., Guffey

v. A.W. Chesterton Co.*, E.D. PA Civil Action No. 2:11-67213-ER, 2012 WL 5395035, at *1

(E.D. Pa. Aug. 28, 2012) (declining to follow *Tragarz*); *Barnes v. Foster Wheeler Corp.*, Civil

Action No. 13-1285 (JBS/JS), 2014 WL 2965699, at *3–4 (D.N.J. June 30, 2014) (distinguishing

the case from *Kurak*).  Mississippi courts have not distinguished between different asbestos-

related diseases when applying the frequency, regularity, and proximity test. *See Gorman-Rupp*,

908 So. 2d at 757 (finding that the frequency, regularity, and proximity test is the proper

standard to apply in asbestos cases); *see also Monsanto*, 912 So. 2d at 136–37 ("[I]n asbestos

litigation cases, the frequency, regularity, and proximity test is the proper standard in

determining exposure and proximate cause."). Moreover, this court has previously used the

---

[5] Plaintiffs argue that "there is no threshold level of exposure required for the development of
mesothelioma" and therefore even a minimal exposure should satisfy the frequency, regularity,
and proximity requirements.  (D.I. 401 at 14–15; D.I. 407 at 5–6; D.I. 408 at 5–6)
[6] Plaintiffs also cite to *Linster v. Allied Signal, Inc.*, 21 A.3d 220 (Pa. Super. Ct. 2011), *Georgia-
Pacific Corp. v. Pransky*, 800 A.2d 722 (Md. 2002), and *Purcell v. Asbestos Corp., Ltd.*, 959
P.2d 89 (Or. App. Ct. 1998) in passing, none of which apply Mississippi law.

frequency, regularity, and proximity standard when applying Mississippi substantive law to a

mesothelioma case. *See Dalton v. 3M Co.*, Civil Action No. 10-113-SLR-SRF, 2013 WL

4886658, at *4–7 (D. Del. Sept. 12, 2013), *report and recommendation adopted*, 2013 WL

5486813 (D. Del. Oct. 1, 2013). Therefore, the court will address the product identification

analysis based on the frequency, regularity, and proximity standard.

### 2. Product liability

Products liability actions in Mississippi are governed by the Mississippi Products

Liability Act ("MPLA"). The MPLA provides that to bring a claim for strict liability, a plaintiff

must prove that at the time the product left the control of the manufacturer or seller, the product

contained a manufacturing defect, design defect, inadequate warnings, or the product breached

an express warranty. Miss. Code Ann. § 11-1-63(a) (2014). Plaintiffs must also show that the

defect rendered the product unreasonably dangerous, and that the condition of the product

proximately caused the damages for which recovery is sought. *Id.*

Under the MPLA, a product may be found defective if it "fail[s] to contain adequate

warnings."[7] § 11-1-63(a)(i)(2). As such, manufacturers and sellers have a duty to warn of

known hazards associated with the use of their products. *See Dalton*, 2013 WL 4886658, at *9

(citing *Scordino v. Hopeman Bros.*, 662 So. 2d 640, 646 (Miss. 1995)). However, manufacturers

and sellers only have a duty to warn of dangers known to them at the time the product leaves his

or her control. *See Noah v. GMC*, 882 So. 2d 235, 239 (Miss. Ct. App. 2004), *cert. denied*, 882

---

[7] The MPLA defines an adequate warning as
> one that a reasonably prudent person in the same or similar circumstances would
> have provided with respect to the danger and that communicates sufficient
> information on the dangers and safe use of the product, taking into account the
> characteristics of, and the ordinary knowledge common to an ordinary consumer
> who purchases the product[.]

Miss. Code Ann. § 11-1-63(c)(ii).

So. 2d 772 (Miss. 2004). Plaintiffs must show that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or should have known about the danger, and "the ordinary user…would not realize its dangerous condition." § 11-1-63(c)(i). The failure to warn must be the proximate cause of the injuries suffered. *3M Co. v. Johnson*, 895 So. 2d 151, 166 (Miss. 2005) (citing *Garner v. Santoro*, 865 F.2d 629, 641–42 (5th Cir. 1989)). The causal link between the alleged injury and the inadequate warning is key to Plaintiffs' claim. *Id.*

### 3. Bare metal defense

Although Mississippi courts have not yet addressed the bare metal defense, this court has previously found that based on the MPLA, Restatement (Second) of Torts § 402A, and case authorities that, "it is reasonably likely that the Supreme Court of Mississippi would follow the majority of jurisdictions that have refused to find defendants liable for other manufacturers' asbestos products." *Dalton*, 2013 WL 4886658, at \*10 (citing *Murray v. General Motors, LLC*, 478 Fed. App'x 175, 182 (5th Cir. 2012) (there is no post-sale duty to warn under Mississippi law); *Scordino*, 662 So. 2d at 643 (strict liability depends on whether defendant is a manufacturer or seller of a product); *Harmon v. Nat'l Auto Parts Ass'n*, 720 F. Supp. 79, 80 (N.D. Miss. 1989) (strict liability is not imposed on one who neither manufactures nor sells the products)). Additionally, at least one Mississippi court has found that "Mississippi's products liability laws 'shield [] companies from liability for products they did not create.'" *Truddle v. Wyeth, LLC*, Civil Action No. 2:11-cv-00207-GHD-SAA, 2015 WL 160696, at \*4 (N.D. Miss. Jan. 12, 2015) (quoting *Lashley v. Pfizer, Inc.*, 750 F.3d 470, 476 (5th Cir. 2014)).

The bare metal defense applies to shield defendants from liability for injuries caused by asbestos components where the defendant neither manufactured nor supplied the product that allegedly caused the plaintiff to be exposed to asbestos. *Dalton*, 2013 WL 4886658, at \*6–7

(citing *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 793 (E.D. Pa. 2012)). Accordingly, courts accepting the bare metal defense refuse to impose liability upon manufacturers for dangers associated with asbestos-containing products manufactured and distributed by other entities. *Id.* at \*7 (citing *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 495 (6th Cir. 2005); *Conner*, 842 F. Supp. 2d at 801; *Surre v. Foster Wheeler LLC*, 831 F. Supp. 2d 797, 801 (S.D.N.Y. 2011); *Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019, 1030 (S.D. Ill. 1989); *O'Neil v. Crane Co.*, 266 P.3d 987, 997–98 (Cal. 2012); *Taylor v. Elliott Turbomachinery Co.*, 90 Cal. Rptr. 3d 414, 429 (Cal. Ct. App. 2009); *In re Asbestos Litig.* (*Howton*), C.A. No. N11C-03218 ASB, 2012 WL 1409011, at \*1 (Del. Super. Ct. Apr. 2, 2012); *In re Asbestos Litig.* (*Wolfe*), C.A. No. N10C-08-258 ASB, 2012 WL 1415706, at \*3–4 (Del. Super. Ct. Feb. 28, 2012); *Braaten v. Saberhagen Holding*s, 198 P.3d 493, 498–99 (Wash. 2008); *Simonetta v. Viad Corp.*, 197 P.3d 127, 134–35 (Wash. 2008)). Therefore, a manufacturer is not subject to a duty to warn or protect against hazards arising from a product it did not manufacture, supply, or sell. *Id.* at \*10.

Plaintiffs argue that *Dalton* is inapplicable because there is some evidence that Defendants required asbestos insulation for their products and knew that the asbestos-containing insulation used by their customers was hazardous. (D.I. 401 at 18; D.I. 407 at 8–9; D.I. 408 at 8–10) Plaintiffs cite to two cases where summary judgment was denied because the defendant's product could not be operated safely without additional insulation, and the use of asbestos-containing insulation was foreseeable: *Berkowitz v. AC&S, Inc.*, 733 N.Y.S.2d 410 (N.Y. App. 2001) and *Chicano v. Gen. Elec. Co.*, No. Civ.A. 03-5126, 2004 WL 2250990 (E.D. Pa. Oct. 5, 2004). (D.I. 401 at 18) However, these cases do not apply Mississippi law, and they have not been adopted by any Mississippi court. In fact, other courts have declined to follow those cases. *See, e.g., Surre*, 831 F. Supp. 2d 797 (S.D.N.Y. 2011); *Schwartz v. Abex Corp.*, Civil Action No.

11

2:05-CV-02511-ER, 2015 WL 3387824 (E.D. Pa. May 27, 2015). The United States District

Court for the District of New York, had this to say about *Berkowitz*—a New York state law case:

> *Berkowitz* is a one-paragraph opinion with no clear holding....The plaintiff alleged,
> *inter alia*, that the defendant had a duty to warn him against the hazards of asbestos
> insulation "on top of and around [the] pumps." Defendant maintained that it did not
> manufacture or install the asbestos to which plaintiff was exposed. The court found
> that defendant might have a duty to warn because defendant's "own witness
> indicated that the government provided certain specifications involving [pump]
> insulation...which [defendant] knew would be made out of asbestos." Thus,
> *Berkowitz* involved more than a mere possibility that asbestos might be used, and
> the case hardly stands for the broad proposition that a manufacturer has a duty to
> warn whenever it is foreseeable that its product will be used in conjunction with a
> defective one.

*Surre,* 831 F. Supp. 2d at 802–03 (internal citations omitted). Accordingly, the court will not

extend *Berkowitz* to find that "a manufacturer has a duty to warn whenever it is foreseeable that

its product will be used in conjunction with a defective one." *Id.*

Additionally, the holding of *Chicano*, which applied Pennsylvania law, was clarified in a

more recent case in that district. *See Schwartz*, 2015 WL 3387824. In *Schwartz*, the court

conducted a thorough analysis of the evolving products liability case law in Pennsylvania. *Id.* at

*4–17. The court noted that since *Chicano*, additional courts had further interpreted the bare

metal defense. *Id.* at *14–16 (citing *Schaffner v. Aesys Techs., LLC*, Nos. 1901 EDA 2008, 1902

EDA 2008, 2010 WL 605275 (Pa. Super. Ct. Jan. 21, 2010); *Kolar v. Buffalo Pumps, Inc.*, No.

0199, 2010 WL 5312168 (Pa. Com. Pl. Aug. 2, 2010); *In re Asbestos Prods. Liab. Litig.*

*(Hoffeditz)*, Civil Action No. 2:09-70103, 2011 WL 5881008 (E.D. Pa. July 29, 2011)).

Considering the subsequent case authorities along with its interpretation of § 402A, the *Schwartz*

court predicted that a manufacturer or supplier would not be strictly liable under Pennsylvania

law for an injury arising from aftermarket insulation it did not manufacture or supply that was

installed on its product. *Id.* at *17. With respect to negligence claims, the court stated:

> To be clear, a product manufacturer is not liable in negligence for injury arising
> from all foreseeable use of asbestos-containing component parts (or all foreseeable
> injury associated with aftermarket component parts). To require a product
> manufacturer to warn of all foreseeable hazards that could arise in connection with
> its product (regardless of whether the manufacture actually knew that such hazards
> would be present) would create an undue burden on those product manufacturers—
> in terms of both efforts required for investigation of potentially foreseeable hazards
> and financial penalties imposed for hazards not discovered—which would deter the
> development and production of goods in our society.

*Id.* at \*19. Thus, foreseeability alone, as set out in *Chicano*, has not been the standard adopted in subsequent decisions, namely, *Schwartz.*

In view of the foregoing, the court recommends against expanding the duty to warn for manufacturers supplying "bare metal" products when it is foreseeable that their products will be used in conjunction with defective products made or sold by a third party.

### 4.  Government contractor defense

Under the test set out in *Boyle v. United Techs. Corp.*, a federal contractor will not be held liable for its product's design defects when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.  487 U.S. 500, 512 (1988).  The defense is applicable to both design defect and failure to warn claims.  *See, e.g., MacQueen v. Union Carbide Corp.*, Civil Action No. 13-831-SLR-CJB, 2013 WL 6571808, at \*3 (D. Del. Dec. 13, 2013), *report and recommendation adopted,* 2014 WL 108535 (D. Del. Jan. 9, 2014); *Walkup v. Air & Liquid Sys. Corp.,* Civil Action No. 12-1635-SLR-SRF, 2013 WL 5448623, at \*2 (D. Del. Sept. 26, 2013), *report and recommendation adopted,* 2013 WL 5798701 (D. Del. Oct. 24, 2013); *In re Asbestos Litig. (Seitz),* 661 F. Supp. 2d 451, 454 (D. Del. 2009); *Kirks v. General Elec. Co.*, 654 F. Supp. 2d 220, 224–25 (D. Del. 2009).  In a failure to warn claim, the first prong of *Boyle* is altered to

13

preclude liability where the government exercised discretion and approved the warnings. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995).[8]  Courts require the government approval to "transcend rubber stamping" for the defense to shield a government contractor from liability for failure to warn. *Id.* at 1156–57.

### 5. Learned intermediary doctrine

Under the common law, a manufacturer's duty to warn is discharged when it provides information to an intermediary, upon whom the manufacturer can reasonably rely to communicate that information to the ultimate end user. *Union Carbide Corp. v. Nix, Jr.*, 142 So. 3d 374, 386 (Miss. 2014).[9]  To use the defense, the manufacturer must show that it provided the "learned intermediary" with information or warning regarding the hazard. *Id.* (citing *Swan v. I.P., Inc.*, 613 So. 2d 846, 851–56 (Miss. 1993)).

### IV.  DISCUSSION

Product exposure is a threshold question: Plaintiffs must show that Defendants' products caused Mr. Malone's injuries. *See Dependable Abrasives, Inc. v. Pierce*, 156 So. 3d 891, 896 (Miss. 2015) (quoting *Banks ex rel. Banks v. Sherwin-Williams Co.*, 134 So. 3d 706, 710 (Miss. 2014)).  Under Mississippi law, Plaintiffs must show that Mr. Malone was exposed to Defendants' asbestos-containing products with the requisite frequency, regularity, and proximity

---

[8] This Sixth Circuit decision has been treated persuasively by Mississippi courts. *See, e.g., Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 353 (5th Cir. 2010); *Perkins v. U.S.*, No. 1:07CV1185 LG-RHW, 2009 WL 2602433, at *2 (S.D. Miss. Aug. 21, 2009); *Bragg v. U.S.*, 55 F. Supp. 2d 575, 591 (S.D. Miss. 1999).

[9] The statutory defense—known as the sophisticated-user defense—protects a manufacturer from liability if the danger posed by the product is known or should have been known to the user, accounting for the common knowledge of those who ordinarily use the product. *Nix,* 142 So. 3d at 386 (citing Miss. Code Ann § 11-1-63(e) (2004)).  CBS raises the common law defense in this case.  (D.I. 9–10)

14

to survive a motion for summary judgment. *See Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 757 (Miss. 2005).

### A. Cummins

The court recommends granting Cummins' motion for summary judgment as there is no genuine issue of material fact in dispute as to whether Mr. Malone was exposed to an asbestos-containing Cummins product with sufficient frequency, regularity, and proximity to meet Mississippi's product nexus requirement.

#### 1. Product identification and causation

Cummins contends that summary judgment is warranted because Plaintiffs failed to produce evidence that "Mr. Malone was exposed to asbestos fibers from a particular Cummins product with the frequency, regularity, and proximity necessary to demonstrate causation." (D.I. 378 at 7) Plaintiffs respond that the causation standard is applied less strictly in mesothelioma cases. (D.I. 401 at 13–14) Additionally, Plaintiffs argue there is a genuine issue of material fact with respect to causation because Mr. Malone insulated exhaust pipes with asbestos on at least twenty generators. (*Id.* at 13–17)

As discussed at § III(B)(1), *supra*, the court will follow *Dalton* in applying Mississippi's frequency, regularity, and proximity standard to this mesothelioma action. *Dalton v. 3M Co.*, Civil Action No. 10-113-SLR-SRF, 2013 WL 4886658, at *7 (D. Del. Sept. 12, 2013), *report and recommendation adopted*, 2013 WL 5486813 (D. Del. Oct. 1, 2013) (citing *Gorman-Rupp*, 908 So. 2d at 757; *Monsanto Co. v. Hall*, 912 So. 2d 134, 136–37 (Miss. 2005)).

Plaintiffs' claims against Cummins arise from Mr. Malone's alleged exposure to external asbestos insulation, which was applied to exhaust piping attached to Cummins' emergency generators. (D.I. 401 at 16, Ex. 1 at 59:7–10, Ex. 2 at 135:15–36:4) Plaintiffs assert that Mr.

Malone used asbestos to insulate exhaust piping on Cummins generators on about twenty ships while working for Badham. (*Id.*, Ex. 1 at 60:3–4) However, Mr. Malone testified that he could not recall which generators were on which ships, or how many times he worked on any one type of generator. (*Id.*)

Although Plaintiffs argue that Mr. Malone was exposed to asbestos from Cummins generators on at least twenty ships, in viewing the facts in the light most favorable to Plaintiffs, the record indicates that Mr. Malone installed external insulation on Cummins and Caterpillar generators, combined, on about ten ships. In preparation for his deposition, Mr. Malone filled out a Work History form listing his employers and thirty-three ships he recalled working on at Ingalls Shipyard. (D.I. 384, Ex. D) However, Mr. Malone did not work on the last ten ships or any of the destroyers listed on the form while employed by Badham. (*Id.*; D.I. 401, Ex. 2 at 34:1–15, Ex. 1 at 25:15–27:2) Removing the last ten ships and the additional destroyers from Mr. Malone's Work History form leaves ten ships on which Mr. Malone worked while employed by Badham. Thus, by his own testimony, Mr. Malone could only have insulated Cummins and Caterpillar brand generators on ten ships, and he cannot specify on which company's generators he worked on each of the ten ships. (D.I. 401, Ex. 2 at 147:4–15)

Mr. Malone did not do any work to the generators themselves, which were already installed on the ship at the time he insulated the exhaust piping. (D.I. 378, Ex. B at 146:14–22) Mr. Malone only applied external insulation to the exhaust piping attached to the generators. (*Id.*, Ex. B at 136:2–8) The external exhaust piping was attached to the generator by a flange. (*Id.*, Ex. B at 151:6–19) Mr. Malone described the insulation process as such a "small" part of his job that he could not remember how the exhaust system operated. (*Id.*, Ex. B at 135:15–36:8)

Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs fail to show that Mr. Malone was exposed to an asbestos-containing Cummins generator with sufficient frequency and regularity, such that it is probable that the exposure caused Mr. Malone's injuries. *See Dalton v. 3M*, Civil Action No. 10-113-SLR-SRF, 2013 WL 4886658, at *7 (D. Del. Sept. 12, 2013), *report and recommendation adopted*, 2013 WL 5486813 (D. Del. Oct. 1, 2013). At best, Mr. Malone testified that a "small" part of his work involved applying asbestos insulation on the exhaust piping of generators. (D.I. 401, Ex. 2 at 135:20–136:8) Such exposure is insufficient to establish causation. "Mere allegations of facts are not sufficient to create a genuine issue of material fact sufficient to defeat a motion for summary judgment." *Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 757 (Miss. 2005). Accordingly, Plaintiffs fail to meet the frequency, regularity, and proximity test because "[Plaintiffs] failed to submit any evidence that demonstrated that [Mr. Malone] had any exposure to an asbestos-containing product attributable to [Cummins]." *Id.* Therefore, Plaintiffs have not established causation, and the court recommends granting Cummins' motion for summary judgment.

### 2. Bare metal defense

Application of the bare metal defense provides an additional basis warranting summary judgment in Cummins' favor. Cummins is not liable "for injuries caused by asbestos components, such as insulation, gaskets, and packing, that were incorporated into [its] products or used as replacement parts, but which [it] did not manufacture or distribute." *Dalton*, 2013 WL 4886658, at *6 (quoting *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 796 (E.D. Pa. Feb. 1, 2012)).

Cummins asserts that "Plaintiffs have presented no evidence that the exhaust piping [or the insulation attached to it] was manufactured, sold or distributed by Cummins." (D.I. 378 at

17

11) Plaintiffs respond that the bare metal defense does not apply because "Cummins required insulation for the exhaust pipes on its generators and knew that the asbestos-containing insulation used by its customers was hazardous." (D.I. 401 at 18–19)

For the reasons stated in *Dalton*, the court finds the bare metal defense applicable to the facts of the instant case. *See* 2013 WL 4886658; *see also Dalton v. 3M Co.*, E.D. PA Civil Action No. 2:10-64604, 2011 WL 5881011, at *1 n.1 (E.D. Pa. Aug. 2, 2011) (explaining that the bare metal defense is an unsettled issue of Mississippi law). In *Dalton*, the plaintiff developed mesothelioma as a result of alleged exposure to asbestos-containing generators while working at Ingalls Shipyard. 2013 WL 4886685, at *2. The plaintiff argued that Foster Wheeler supplied external asbestos insulation for use on its generators, and it directed individuals to use asbestos in its design manuals. *Id.* at *11–12. The plaintiff was only exposed to external insulation applied to the generators after the generators were installed on the ships. *Id.* at *2, *11. Additionally, the manuals alleged to have directed the use of asbestos were not actually supplied by Foster Wheeler. *Id.* at *12. Therefore, the court granted summary judgment in favor of Foster Wheeler, finding that Foster Wheeler could not be liable for injuries caused by products that it did not supply. *Id.*

In the present action, there is no evidence in the record demonstrating that Cummins supplied the asbestos-containing insulation Mr. Malone used to insulate a generator's exhaust piping. The asbestos-containing insulation materials he used were supplied by his employer, Badham, not Cummins, and Badham obtained its asbestos insulation materials from Owens-Corning, Kaylo, Shook & Fletcher, or John's-Manville. (D.I. 378, Ex. B at 44:10–46:20, 149:6–8)

18

Moreover, there is nothing in the record demonstrating that Cummins required or instructed its customers to insulate the generator exhaust piping with asbestos. Plaintiffs refer to Cummins' Marine Diesel Application Practices manual to assert that Cummins instructed end users to insulate exhaust piping. (D.I. 401 at 9, Ex. 5 at 5; 7/1/15 Tr. at 59:12–60:24) However, Cummins' counsel pointed out at oral argument that the manual refers to "turbo-charged propulsion engines for small crafts such as tugboats, small fishing boats, pleasure craft, [and] not backup generators used in the large and sophisticated naval vessels." (7/1/15 Tr. at 57:1–7) Even with turbo-charged propulsion engines, the manual does not direct users to apply asbestos insulation to the exhaust piping attached to Cummins emergency generators. (D.I. 401, Ex. 5 at 6–7) The manual states that "[t]he application practices described…are intended to assist sales personnel in selecting machinery for quoting purposes only." (*Id.*, Ex. 5 at 1) Additionally, the manual states that the exhaust system piping "should be lagged or water cooled." (*Id.*, Ex. 5 at 5) The court has not been directed to a specific reference to asbestos or application of asbestos insulation to the exhaust piping.

Plaintiffs submitted deposition testimony from Cummins' corporate representative, Robert Weimer, in a separate asbestos-related action.[10] (*Id.* at 9, Ex. 6) Plaintiffs assert that Mr. Weimer's testimony indicates that a separate Cummins manual instructed end users to remove and apply asbestos insulation. (*Id.* at 9, Ex. 6 at 119:3–121:3) However, Mr. Weimer's testimony refers to a manual covering an entirely different product than the generators at issue. (*Id.*) He specifies a turbine made for a Coast Guard pleasure boat craft, not turbines used aboard Navy vessels. (*Id.*) Furthermore, Mr. Weimer's testimony refers to disassembling a turbine

---

[10] Mr. Weimer testified as a Cummins corporate representative on October 7, 2008 in connection with a Louisiana state court action, *Pellegal v. Northrop Grumman Ship Systems, Inc. et al.*, Case No. 07-7749. (D.I. 401, Ex. 6)

turbocharger by removing the turbocharger blanket, not to insulating generator exhaust piping. (*Id.*)

The court declines to expand the duty to warn for manufacturers supplying "bare metal" products when it is foreseeable that their products will be used in conjunction with defective products made by third parties. *See* § III(B)(3), *supra.* However, assuming, *arguendo*, that foreseeability alone was the proper standard to apply, the record does not indicate that it was foreseeable that end users would apply asbestos to Cummins emergency generators. Neither the Marine Diesel Application Practices manual nor Mr. Weimer's testimony support an inference that Cummins required or instructed end users to apply asbestos to its generators. Therefore, Plaintiffs have not shown the existence of a material issue of fact as to whether Cummins owed a duty to warn of asbestos-containing insulation supplied by a third party, which was used to insulate exhaust pipes attached to the generators it manufactured. *See Dalton v. 3M Co.*, Civil Action No. 10-113-SLR-SRF, 2013 WL 4886658 (D. Del. Sept. 12, 2013), *report and recommendation adopted*, 2013 WL 5486813 (D. Del. Oct. 1, 2013).

**B. CBS**

The court should grant CBS's summary judgment motion, as there is no genuine issue of material fact in dispute regarding whether Mr. Malone was exposed to an asbestos-containing product manufactured or distributed by Westinghouse.

**1. Product identification and causation**

CBS contends that summary judgment is warranted because "the undisputed evidence reflects a failure of proof that Mr. Malone was ever exposed to any asbestos-containing product or material which was manufactured or supplied by Westinghouse." (D.I. 382 at 7) Plaintiffs respond that "[t]here is at least a genuine issue of material fact as to whether Malone's exposure

20

was of sufficient frequency, regularity, and proximity to meet Mississippi's product nexus requirement [because] Malone specifically recalled insulating Westinghouse turbines." (D.I. 408 at 7–8) Additionally, Plaintiffs argue that the frequency, regularity, and proximity standard should be applied "less rigidly" in mesothelioma cases. (*Id.* at 6)

Plaintiffs' claims against Westinghouse arise from Mr. Malone's alleged exposure to external asbestos insulation, which Mr. Malone applied to the tops and bottoms of the turbines. (*Id.*, Ex. 1 at 51:10–52:13, 23:13–24:1) Plaintiffs assert that Mr. Malone worked on Westinghouse turbines on approximately twenty ships while working at Ingalls Shipyard. (*Id.* at 7) Mr. Malone testified that turbine insulation projects required 100 to 150 man hours of labor to complete "from the fitting and measuring [to] preparing the cloth." (*Id.*, Ex. 1 at 51:10–52:20) Mr. Malone was exposed to asbestos because the process of applying insulation to the turbines generated respirable asbestos fibers in areas with minimal ventilation. (*Id.* at 7)

However, Mr. Malone testified that he could not identify specifically working with a Westinghouse turbine on any particular ship. (*Id.*, Ex. 2 at 118:20–24) He did not know if any specific manufacturer's turbines appeared more frequently than others aboard the ships. (*Id.*, Ex. 2 at 118:25–119:3) He testified that all turbines generally looked the same. (*Id.*, Ex. 2 at 119:21–120:15) Mr. Malone also testified that he did not know how big Westinghouse turbines were. (*Id.*, Ex. 2 at 120:21–121:3) Finally, he affirmed that he had no knowledge that he was ever exposed to asbestos from a product manufactured or sold by Westinghouse. (*Id.*, Ex. 2 at 121:23–122:3)

Accordingly, viewing the facts in the light most favorable to Plaintiffs, Plaintiffs fail to show that Mr. Malone was exposed to an asbestos-containing Westinghouse turbine with sufficient frequency and regularity, such that it is probable that the exposure caused Mr.

Malone's injuries. *See Dalton v. 3M*, Civil Action No. 10-113-SLR-SRF, 2013 WL 4886658, at

*7 (D. Del. Sept. 12, 2013), *report and recommendation adopted*, 2013 WL 5486813 (D. Del.

Oct. 1, 2013). "Mere allegations of facts are not sufficient to create a genuine issue of material

fact sufficient to defeat a motion for summary judgment." *Gorman-Rupp Co. v. Hall*, 908 So. 2d

749, 757 (Miss. 2005).

### 2.  Bare metal defense

Application of the bare metal defense provides an additional basis warranting summary

judgment in CBS's favor.  CBS contends that Plaintiffs fail to show that Mr. Malone was injured

by asbestos-containing products manufactured, supplied, or sold by Westinghouse. (D.I. 382 at

1, 7–8) Plaintiffs argue that the bare metal defense does not apply because "Westinghouse

required insulation for its turbines, and it was foreseeable that end users would apply asbestos-

containing insulation to Westinghouse turbines." (D.I. 408 at 8)

"[A] manufacturer is not subject to a duty to warn or protect against hazards arising from

a product it did not manufacture, supply, or sell." *See Dalton*, 2013 WL 4886658, at *10.  Mr.

Malone's alleged exposure to asbestos-containing Westinghouse products is limited to working

with the external insulation on Westinghouse turbines. (D.I. 408, Ex. 1 at 51:10–52:13) Mr.

Malone applied the external insulation to the tops and bottoms of turbines.  (*Id.*) He testified that

the turbines he maintained arrived at Ingalls Shipyard "bare metal." (*Id.*, Ex. 2 at 121:17–19, Ex.

1 at 51:10–52:13) He used insulation supplied by his employer, Badham, to insulate the turbines.

(D.I. 382, Ex. A at 56:3–8) Badham generally used insulation manufactured by Owens-Corning,

Kaylo, and John's Manville. (D.I. 408, Ex. 2 at 44:10–45:22)

Companies sent calcium silicate with the turbines "one or two or three times in [Mr.

Malone's] whole career." (*Id.*, Ex. 1 at 56:7–13) However, Mr. Malone could not specifically

recall which companies sent calcium silicate with their turbines. (*Id.*, Ex. 1 at 55:5–56:13) Although Mr. Malone testified that company representatives advised machinists about insulation, he also testified that he never spoke with such representatives about the work, and he was not privy to the representatives' conversations with the machinists. (*Id.*, Ex. 1 at 55:8–57:12) Additionally, Mr. Malone did not remember a Westinghouse representative ever present at the shipyard. (*Id.*, Ex. 2 at 56:14–21)

Plaintiffs rely on CBS corporate representative Douglas Ware's deposition testimony in a separate action to support the position that Westinghouse supplied and recommended asbestos insulation for use on its turbines.[11] (*Id.*, Ex. 5 at 31:13–37:8) Mr. Ware testified that land-based turbines operating over 400 degrees were designed to incorporate insulation. (*Id.*, Ex. 5 at 35:14–25) He testified that Westinghouse knew such turbines would at some point be insulated by either Westinghouse or the customer. (*Id.*, Ex. 5 at 35:14–19) Additionally, Westinghouse occasionally supplied insulation with its turbines at the customer's request. (*Id.*, Ex. 5 at 36:21–37:21) However, Mr. Ware testified about "land-based turbines," not the marine turbines that Mr. Malone maintained at the shipyard. (*Id.*, Ex. 5 at 31:13–37:21; D.I. 416 at 3) He also testified that "some" Westinghouse specifications called for turbines to include asbestos block prior to 1973, but Mr. Ware did not testify that all turbines, whether land-based or marine-based, were designed to incorporate asbestos components. (D.I. 408, Ex. 5 at 40:14–19)

The court declines to expand the duty to warn for manufacturers supplying "bare metal" products when it is foreseeable that their products will be used in conjunction with defective products made by third parties. *See* § III(B)(3), *supra.* However, assuming, *arguendo*, that

---

[11] Douglas Ware was deposed on August 10, 2011 in connection with a United States District Court for the Eastern District of Pennsylvania case, *Rabovsky v. Air & Liquid Systems Corp.*, Civil Action No. 2:10-cv-03232-ER. (D.I. 408, Ex. 5)

foreseeability alone was the proper standard to apply, the record does not indicate that Westinghouse instructed end users to insulate the turbines at issue with asbestos. Mr. Ware's testimony refers to land-based turbines, and Plaintiffs do not submit evidence that Westinghouse directed end users to apply asbestos to marine-based turbines. Furthermore, Mr. Malone did not remember a Westinghouse representative ever present at the shipyard to instruct machinists about maintenance.

If Westinghouse required its turbines to be insulated with asbestos, the evidence does not establish that Westinghouse manufactured or supplied such insulation. *See King v. Allen Bradley Co.*, E.D. PA Civil Action No. 2:13-06106-ER, 2015 WL 9583367, at *1 (E.D. Pa. Mar. 6, 2015) (although there was evidence that Westinghouse required or recommended the use of asbestos insulation, the bare metal defense applied because there was no evidence that Westinghouse supplied or manufactured the insulation at issue); *Kilgore v. Allen-Bradley Co.*, E.D. PA Civil Action No. 2:13-04029-ER, 2014 WL 7648983, at *1 (E.D. Pa. Nov. 12, 2014) (same); *Devries v. Gen. Elec. Co.*, E.D. PA Civil Action No. 5:13-00474-ER, 2014 WL 6746795, at *1 (E.D. Pa. Oct. 10, 2014) (same). Mr. Malone testified that the turbines arrived "bare metal" and his employer supplied the insulation he applied to turbines. Therefore, Plaintiffs have not shown the existence of a material issue of fact as to whether Westinghouse owed a duty to warn or protect against hazards arising from a product it did not manufacture, supply, or sell. *See Conner v. v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 796 (E.D. Pa. 2012).

### 3. Learned intermediary doctrine

The court recommends granting summary judgment based upon product identification, causation, and the bare metal defense. However, CBS asserts an additional basis for judgment as a matter of law pursuant to the learned intermediary doctrine.

24

For the learned intermediary doctrine to apply, CBS must provide evidence that it provided the "learned intermediary," or the third party purchaser, with information or warning. *Union Carbide Corp. v. Nix, Jr.*, 142 So. 3d 374, 386 (Miss. 2014) (citing *Swan v. I.P., Inc.*, 613 So. 2d 846, 851–56 (Miss.1993)).

Although CBS points to evidence that the Navy was aware of the dangers of asbestos, it offers no facts of record to support whether Westinghouse reasonably relied on the Navy to warn users like Mr. Malone of the hazard.[12] *See id.* at 386 (a defendant cannot claim that it relied on a third party to warn a plaintiff when it is unclear form the record whether it provided the third party with a warning); *Dalton v. 3M Co.*, E.D. PA Civil Action No. 2:10-64604, 2011 WL 5881011, at *1 (E.D. Pa. Aug. 2, 2011) (it could not be determined that it was reasonable for the defendant to rely on the third party to warn the plaintiff when there was a genuine issue of material fact as to whether the defendant had superior knowledge than the Navy about the hazards of asbestos). Consequently, the court recommends that summary judgment based on the learned intermediary doctrine is not warranted. However, for the reasons discussed in the preceding sections, CBS is, nonetheless, entitled to summary judgment based upon product identification, causation, and the bare metal defense. *See* § IV(B)(1)–(2).

### 4. Government contractor defense

CBS asserts the government contractor defense as another basis for judgment as a matter of law. The government contractor defense shields defendants from liability for acts arising out

---

[12] The parties dispute whether the learned intermediary doctrine applies in this case when Mr. Malone was employed as an independent contractor, and not directly by the Navy. The court need not discuss this distinction because it does not alter the court's recommendation for summary judgment on other grounds.

of the performance of a federal contract. *See Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794,

797 (5th Cir. 1993). A federal contractor is not liable for failure to warn when:

> (1) the United States exercised its discretion and approved the warnings, if any;
> (2) the contractor provided warnings that conformed to the approved warnings; and
> (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.

*See Hicks v. Boeing Co.*, Civil Action No. 13-393-SLR-SRF, 2014 WL 1051748, at *5 (D. Del.

Mar. 17, 2014), *report and recommendation adopted*, 2014 WL 1391104 (D. Del. Apr. 8, 2014)

(quoting *MacQueen v. Union Carbide Corp.*, Civil Action No. 13-831-SLR-CJB, 2013 WL

6571808, at *4 (D. Del. Dec. 13, 2013), *report and recommendation adopted*, 2014 WL 108535

(D. Del. Jan. 9, 2014)).

With respect to the first *Boyle* factor, CBS points to Navy specifications ("MilSpecs")

and an Affidavit from Admiral Roger B. Horne Jr. RADM USN (Ret.) as evidence that the Navy

specified and approved all warnings that would be used with its equipment. (D.I. 382 at 3–4)

Admiral Horne testified, "The Navy will use previously developed military specifications

("MilSpecs"), create any additional specifications that may be required, and then issue a request

for bids from qualified contractors in an effort to identify a contractor with the capability and

capacity to create a design and to manufacture a turbine that satisfies its new military

requirements." (*Id.*, Ex. B at ¶ 10) "The MilSpecs for Navy equipment were drafted, approved

and maintained by the Navy…." (*Id.*, Ex. B at ¶ 17) "[T]he Navy retained the 'final say' over the

design attributes of naval ships and their equipment." (*Id.*, Ex. B at ¶ 21)

However, Plaintiffs argue that the Navy required equipment manufacturers to provide

their own warnings or "safety precautions" with their equipment. (D.I. 408 at 15, Ex. 16 at S1-1-

h) Specifically, MIL-B 1507 (SHIPS) required manufacturers to include safety notices regarding

"special hazards" associated with equipment. (*Id.*, Ex. 18 at 3.3.1.1) MIL-M-15071G required

26

manufacturers to identify hazardous components and describe handling precautions for such components. (*Id.*, Ex. 21 at 3.6.3.4.3) Moreover, SECNAV Instruction 6260 provided that "[t]he type of labels to be affixed by the manufacturer…are governed by state and federal laws and regulations…." (*Id.*, Ex. 23 at 2) The Instruction also adopts the Manufacturing Chemists Association's "Warning Labels Guide," which emphasizes that the "warning labels suggested in the Manual should be used in addition to, or in combination with, any label required by law." (*Id.*, Ex. 25 at 6) MIL-STD 129B also required warnings to comply with the Warning Labels Guide. (*Id.* at 17, Ex. 27 at 6)

A factual question exists as to whether the cited military specifications cover the turbines at issue, and therefore, whether the Navy required manufactures to create their own warning labels. Consequently, genuine issues of material fact remain with respect to the first two elements of the *Boyle* analysis: (1) whether the government exercised discretion and approved the warnings at issue, and (2) whether the contractor provided warnings that conformed to the approved warnings. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 512–13 (1988); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995). Therefore, the court recommends that summary judgment based on the government contractor defense is not warranted. However, for the reasons discussed at § IV(B)(1)–(2), *supra*, CBS is, nonetheless, entitled to summary judgment based upon product identification, causation, and the bare metal defense.

### C. Foster Wheeler

The court recommends granting Foster Wheeler's motion for summary judgment, as there is no issue of material fact in dispute as to whether exposure to an asbestos-containing Foster Wheeler product caused Mr. Malone's alleged injury.

### 1.  Product identification and causation

Foster Wheeler contends that summary judgment is proper because Plaintiffs fail to show that Mr. Malone worked regularly and frequently in proximity to Foster Wheeler asbestos-containing products.  (D.I. 380 at 7–8) Plaintiffs respond that a genuine issue of material fact exists because Mr. Malone testified that he installed insulation on Foster Wheeler boilers, which resulted in a significant amount of exposure to asbestos dust.  (D.I. 407 at 7)

Mr. Malone initially identified working with Foster Wheeler boilers at Ingalls Shipyard. (D.I. 380, Ex. A at 46:22–47:5) However, Mr. Malone could not describe or quantify the number of Foster Wheeler boilers with which he worked.  (D.I. 407, Ex. 2 at 117:7–21, Ex. 1 at 48:20–24) Additionally, he admitted that he did not specifically recall insulating a Foster Wheeler boiler as opposed to any other boiler.  (*Id.*, Ex. 2 at 117:22–118:1)  Moreover, Mr. Malone admitted on cross-examination that he did not think he was ever exposed to a product manufactured or sold by Foster Wheeler.  (*Id.*, Ex. 2 at 118:5–10) Accordingly, even if Mr. Malone was exposed to asbestos while insulating boilers at Ingalls Shipyard, Plaintiffs fail to show that he worked on or in proximity to an asbestos-containing Foster Wheeler boiler with sufficient frequency and regularity.  *See Gorman-Rupp Co. v. Hall*, 908 So. 2d 749, 754–757 (Miss. 20015).  Therefore, the court recommends granting Foster Wheeler's motion for summary judgment on the threshold matter of product identification and causation.

### 2.  Bare metal defense

Application of the bare metal defense provides an additional basis warranting summary judgment in Foster Wheeler's favor.  Foster Wheeler asserts that "it did not manufacture, supply, or design the asbestos-containing product to which Plaintiffs allege Mr. Malone was exposed." (D.I. 380 at 8) Plaintiffs contend that the bare metal defense does not apply because Foster

Wheeler required asbestos insulation for its boilers, and it was foreseeable that end users would apply asbestos-containing insulation to its boilers. (D.I. 407 at 8)

Foster Wheeler cannot be liable "for injuries caused by asbestos components…that were incorporated into [Foster Wheeler's] products…but which [Foster Wheeler] did not manufacture or distribute." *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 794 (E.D. Pa. Feb. 1, 2012).

There is nothing in the record demonstrating that Foster Wheeler manufactured the asbestos-containing insulation Mr. Malone used on Foster Wheeler boilers. The boilers arrived bare metal to the shipyard, and Mr. Malone testified that he would not have been exposed to asbestos until he applied insulation to the outside of the boiler. (D.I. 407, Ex. 2 at 30:17–31:19) Owens-Corning, Kaylo, Shook & Fletcher, or Johns-Manville supplied that insulation to Mr. Malone's employer, Badham. (*Id.*, Ex. 2 at 44:10–45:22) Furthermore, Mr. Malone did not remember if he saw maintenance specifications provided by any manufacturer in particular. (*Id.*, Ex. 2 at 114:25–115:7)

Plaintiffs maintain that Foster Wheeler's "Insulation Standards Catalog" directed individuals to use external asbestos insulation on its products. (*Id.* at 9–10, Ex. 5) However, the Insulation Standards Catalog does not require the use of asbestos. (*Id.*, Ex. 5 at § 82B-159) Instead, it lists asbestos as one of the many approved materials that may be used with Foster Wheeler products. (*Id.*)

The court declines to expand the duty to warn for manufacturers supplying "bare metal" products when it is foreseeable that their products will be used in conjunction with defective products made by a third party. *See* § III(B)(3), *supra*. However, assuming, *arguendo*, that the foreseeability standard controls, the evidence does not indicate that it was foreseeable that end users would apply asbestos to Foster Wheeler boilers. Because the Insulation Standards Catalog

29

does not explicitly instruct end users to use asbestos, Plaintiffs have not shown that Foster

Wheeler Required external asbestos insulation on its boilers. *See Dalton v. 3M Co.*, Civil Action

No. 10-113-SLR-SRF, 2013 WL 4886658, at *12 (D. Del. Sept. 12, 2013), *report and*

*recommendation adopted*, 2013 WL 5486813 (D. Del. Oct. 1, 2013) ("the court should grant

Foster Wheeler's motion for summary judgment because the Plaintiffs have not shown that

Foster Wheeler required external asbestos insulation on its steam generators). Therefore,

Plaintiffs have not shown the existence of a material issue of fact as to whether Foster Wheeler

owed a duty to warn of the asbestos-containing insulation supplied by third parties, which was

used to externally insulate Foster Wheeler boilers. *See id.*

### 3.  Government contractor defense

The court recommends granting summary judgment based upon product identification,

causation, and the bare metal defense. However, Foster Wheeler asserts an additional basis for

judgment as a matter of law pursuant to the government contractor defense.

Plaintiffs cite to the same specifications relied upon in their response to CBS in arguing

that the government contractor defense does not apply. As discussed at § IV(B)(4), *supra*,

genuine issues of material fact exist as to whether the Navy exercised discretion over the

warning labels at issue, and whether the contractor provided warnings that conformed to the

approved warnings. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 512–13 (1988); *Tate v.*

*Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir. 1995) (altering the first *Boyle* factor for failure

to warn claims). Foster Wheeler asserts that the cited specifications do not cover asbestos or

products not manufactured by the Navy,[13] but Foster Wheeler's contention is a factual question

---

[13] Specifically, Foster Wheeler argues that SECNAV Instruction 6260 only applies to products
produced by the Navy, but Plaintiffs' exhibit says that the Instruction "applies to materials
received from any supply source, provided the material is intended for ultimate use at the local

for the jury. Consequently, the court recommends that summary judgment based on the government contractor defense is not warranted. However, for the reasons discussed at § IV (C)(1)–(2), *supra*, Foster Wheeler is, nonetheless, entitled to summary judgment based upon product identification, causation, and the bare metal defense.

## V.   CONCLUSION

For the foregoing reasons, and as addressed in the chart *infra*, the court recommends granting Cummins' motion for summary judgment, granting CBS' motion for summary judgment, and granting Foster Wheeler's motion for summary judgment.

| Defendant | Motion for Summary Judgment |
|---|---|
| Cummins, Inc. | GRANT |
| CBS Corporation | GRANT |
| Foster Wheeler Energy Corporation | GRANT |

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

---

activity." (D.I. 421 at 8; D.I. 407, Ex. 23 at Enclosure 1) Additionally, a fact question remains because the documents that each party cites to as the Instruction have different Instruction numbers and dates. (D.I. 407, Ex. 23; D.I. 421, Ex. B)

Dated: August **29** , 2016

Sherry R. Fallon
United States Magistrate Judge